2016 IL App (1st) 143908

No. 1-14-3908

FIFTH DIVISION
May 13, 2016

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| GOWHAR KHAN, M.D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CH 3027 |
| | ) | |
| THE DEPARTMENT OF HEALTHCARE AND | ) | |
| FAMILY SERVICES and JULIE HAMOS, Director | ) | |
| of The Department of Healthcare and Family Services, | ) | The Honorable |
| | ) | Kathleen Pantle, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Gordon concurred in the judgment and opinion.

**O P I N I O N**

¶ 1     Plaintiff, Gowhar Khan, M.D., appeals the order of the circuit court affirming the decision of defendant, the Illinois Department of Healthcare and Family Services (Healthcare Department), finding plaintiff provided medical care in the Illinois Medical Assistance Program (Medicaid) that was of grossly inferior quality, placed recipients at risk of harm, and was in excess of patient needs.  Based on defendant's findings, plaintiff was suspended from the Medicaid program for 12 months.  Plaintiff contends: (1) defendant's witness was not qualified to provide expert medical testimony: (2) the expert witness' testimony was speculative;

(3) defendant failed to demonstrate harm as required by the statute; and (4) the administrative law judge (ALJ) made multiple factual errors. Based on the following, we affirm.

¶ 2                                    FACTS

¶ 3      Plaintiff is a licensed physician in Illinois, specializing in rheumatology. He was enrolled as a Medicaid provider during the relevant time period. Defendant regularly conducts audits of the Medicaid program providers through a medical quality review committee (quality committee) to assure quality of care. The quality committee consists of three physicians. After completing a review of plaintiff's medical records for 15 Medicaid patients from 2008 to 2010, defendant notified plaintiff of its intent to terminate his eligibility to participate as a provider in the Medicaid program. Specifically, defendant alleged that plaintiff violated section 12-4.25 of the Illinois Public Aid Code (Code) (305 ILCS 5/12-4.25 (West 2012)) by providing care that was of grossly inferior quality, put patients at risk of harm, and exceeded patients' needs where plaintiff excessively prescribed narcotics, inadequately managed patients' diabetes, failed to provide preventative care, and failed to follow up on issues identified in previous office visits. Plaintiff requested a hearing.

¶ 4      An administrative hearing convened in September 2012 before the ALJ and concluded in December 2012. Two witnesses testified: plaintiff testified on his own behalf and Dr. Jesse Park testified, over plaintiff's objection, on behalf of defendant. Dr. Park, a licensed physician in Illinois, was a member of the quality committee that recommended plaintiff's termination from the Medicaid program. Dr. Park practices and is board-certified in internal medicine. Despite plaintiff's objection, the ALJ found Dr. Park qualified to provide expert testimony. Dr. Park testified regarding the general standards of care and specifically addressed plaintiff's failures to meet those standards with regard to the patients at issue. Dr. Park testified that, based on his

review of plaintiff's patient records, plaintiff provided grossly inferior patient care (count I), placed patients at risk of harm (count II), and furnished medical goods or services in excess of patient need (count III). With regard to counts I and II, the bases for the findings were that plaintiff prescribed an excess of narcotics, inadequately managed and treated diabetes, failed to provide preventative care, and failed to follow up on issues identified in previous office visits. For count III, the basis for the finding was plaintiff's prescription of excess narcotics.

¶ 5      After the close of the administrative hearing, the ALJ prepared a 51-page report dated May 14, 2013, concluding that the allegations against plaintiff had been proven by a preponderance of the evidence. In doing so, the ALJ relied on the documentary evidence and expressly found Dr. Park to be a persuasive and credible witness. The ALJ determined that, although plaintiff's actions provided a sufficient basis for termination, a 12-month suspension would be a sufficient remedy. Plaintiff then requested review of the ALJ's decision by the director of the Healthcare Department. In a letter dated January 31, 2014, the director of the Healthcare Department adopted the recommended decision of the ALJ as the Healthcare Department's final administrative decision.

¶ 6      Plaintiff subsequently sought administrative review of that decision in the circuit court. The circuit court affirmed the Healthcare Department's decision. This appeal followed.

¶ 7                                        ANALYSIS

¶ 8      As an initial matter, we set out the applicable standards of review. This court reviews the final decision of the ALJ under the Illinois Administrative Review Law (65 ILCS 5/1-2.1-7 (West 2012); 735 ILCS 5/3-101 *et seq*. (West 2012)). Judicial review of an administrative decision extends to all questions of law and fact presented by the entire record. 735 ILCS 5/3-110 (West 2012). The findings and conclusions of the administrative agency are considered

*prima facie* true and correct. *Id.* That said, the standard of review depends on the question presented. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532 (2006). Determinations involving questions of fact will not be reversed unless they are against the manifest weight of the evidence. *Id.* "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). In contrast, determinations of law are reviewed *de novo*. *Marconi*, 225 Ill. 2d at 532. Lastly, mixed questions of law and fact are reviewed under the clearly erroneous standard. *Id.* No matter the standard of review, the plaintiff seeking administrative review bears the burden of proof. *Id.* at 532-33. This court reviews the decision of the administrative agency and not that of the circuit court. *Id.* at 531.

¶ 9                                    I. Expert Qualifications

¶ 10    Plaintiff first contends that the Healthcare Department's witness, Dr. Park, was unqualified to provide expert medical testimony in this case. More specifically, plaintiff argues that Dr. Park was not qualified to testify as an expert because he did not practice rheumatology and did not treat Medicaid patients. According to plaintiff, Dr. Park was unqualified where the ALJ found that Park merely "dealt with" rheumatology complaints. Plaintiff maintained having "dealt" with rheumatologic patients did not equate to treating such patients, especially where Dr. Park referred his patients to specialists.

¶ 11    In *Purtill v. Hess*, 111 Ill. 2d 229 (1986), the supreme court articulated the requirements necessary to demonstrate a physician's qualifications and competency to testify as an expert. More specifically, the supreme court provides that: (1) the physician must be a licensed member of the school of medicine about which he proposes to testify; and (2) "the expert witness must

4

show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community." *Id*. at 243. With regard to the first element, "[w]hether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant but, rather, whether the allegations of negligence concern matters within his knowledge and observation." *Jones v. O'Young*, 154 Ill. 2d 39, 43 (1992). With regard to the second element, a physician is required to possess and apply that degree of knowledge, skill, and care that a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances. *Purtill*, 111 Ill. 2d at 242 (citing Restatement (Second) of Torts § 299A cmt. e (1965)). Once the foundational requirements have been met, it is within the trial court's discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care. *Id*. at 243.

¶ 12    In this case, Dr. Park is board-certified in internal medicine, while plaintiff is trained in internal medicine with a subspecialty in rheumatology. Plaintiff is not board-certified in internal medicine. His subspecialty is based on a two-year fellowship in rheumatology. Dr. Park testified that his medical education included training in rheumatology. He further discussed his treatment of patients with rheumatology, diabetes, heart disease, pain management, and preventative care. Dr. Park testified that he treated these "generalized conditions" on a "regular basis," dealing with rheumatologic patients "all the time." According to Dr. Park, he frequently dealt with rheumatologic issues as he had a large population of geriatric patients. He explained:

> "when you say rheumatologic, you're defining a specialty, but all internists are capable
>
> and are trained to deal with arthritic rheumatologic conditions. We were originally

hospital-based and this is considered as part of our core curriculum.  Now, we are not subspecialized, but rheumatology is considered to be in our realm of ordinary expertise."

In addition, Dr. Park testified that:

"What I'm saying is that the standard I tried to apply to Dr. Khan is that he's a community physician, I'm a community physician, I tried to look at what my peers would do, what their current practice management is and apply the community standard to his care, if not the written defined standard so my criteria, my standard was based on how I practice and how my peers in the community feel that we should practice in terms of definition and immunization.  It is not based on a certain written—because everybody is different."

¶ 13     We conclude that Dr. Park properly was allowed to testify as an expert based on his qualifications and competency.  Dr. Park's testimony demonstrated that he did not merely deal with rheumatologic complaints, as argued by plaintiff.  The use of the word "dealt" in the record was not indicative of lack of treatment.  Rather, a reading of the testimony in context clearly demonstrates that Dr. Park regularly treated rheumatologic patients.  Moreover, the fact that Park referred patients to specialists when their cases were complicated and "beyond our scope of care" does not negate his ability to testify regarding the standard of care of the patients in question.

¶ 14     Furthermore, Park testified regarding the general standard of care required for all physicians treating similar patients.  Dr. Park's lack of participation in the Medicaid program did not prevent him from testifying as an expert on patient care, even for Medicaid patients.  The supreme court has recognized that "today [there are] relatively uniform standards for the education and the licensing of physicians," such that physicians in rural areas possess a degree of competency similar to that of physicians in urban areas.  *Id*. at 246 (recognizing the limited

utility of the "similar locality" rule where there are certain uniform standards applicable to a given situation regardless of locality). Plaintiff's argument regarding the limitations of the Medicaid program in terms of payment for specific services did not affect the level of care to which those patients were entitled. Nor did Dr. Park's testimony regarding the lack of *written* uniform standards demonstrate an inability to testify to the standard of care appropriate for plaintiff's patients. Overall, Dr. Park demonstrated he was competent to testify regarding the knowledge, skill, and care that a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances.

¶ 15    In sum, we find that the foundational requirements were satisfied for Dr. Park to testify as an expert. Any additional arguments regarding Dr. Park's limitations as a physician regularly practicing rheumatology in a Medicaid setting concerned the weight to be accorded his testimony. See *Gill v. Foster*, 157 Ill. 2d 304, 316-17 (1993). We, therefore, conclude that the ALJ did not abuse her discretion in admitting Dr. Park's expert testimony.

¶ 16                                    II. Insufficient Testimony

¶ 17    Plaintiff next contends that Dr. Park's testimony was insufficient because it was based on guesses and speculation. More specifically, plaintiff argues that, since Dr. Park had difficulty reading plaintiff's patient records, Dr. Park's opinions were based on incomplete information and speculation. Plaintiff additionally contends that medical care can be provided without documentation.

¶ 18    Plaintiff's patient records were replete with absences of documentation regarding patient care, preventative care, testing, and prescription details, including the prescribing of narcotics. Plaintiff testified that his record keeping was systematic, in that the absence of documentation meant something to him, but he admitted that his patient charts were incomplete. Plaintiff

blamed the gaps in his records due to the circumstances of his care, *e.g.*, if he authorized a prescription while driving. Plaintiff, however, has not cited any authority to support his argument that documentation was not required. Instead, section 5-5 of the Code mandates that "[a]ll dispensers of medical services shall be required to maintain and retain business and professional records sufficient to fully and accurately document the nature, scope, details and receipt of the health care provided to persons eligible for medical assistance under this Code, in accordance with regulations promulgated by the Illinois Department." 305 ILCS 5/5-5 (West 2012). We recognize that the Healthcare Department did not expressly charge plaintiff with a violation of section 5-5 of the Code; however, we find the statute directly contradicts plaintiff's argument and his practices.

¶ 19    Dr. Park testified that patient charts should have a problem list to assist in keeping track of cancer screening guidelines and vaccinations. In addition, Dr. Park stated that every patient chart should have a page listing problems, medications, allergies, and dates. Instead, with regard to plaintiff, the testimony demonstrated that there was no record of test results ordered for patients needing MRIs or blood tests for diabetics, no record of follow-ups on referrals to specialists, no record of preventative care administered, including vaccinations, cancer screenings, or bone density scans, no record of follow-up care following diagnoses, and no record of prescribing narcotics, dosage information, or refill requests. Dr. Park opined, and the ALJ agreed, that "no documentation" meant nothing was provided by plaintiff. The challenged testimony repeatedly involved Dr. Park's attempt to decipher plaintiff's incomplete and unreadable patient charts. We find that plaintiff's failure to comply with the documentation requirements for physicians in general, and the Medicaid program in particular, does not make Dr. Park's testimony speculative. Instead, plaintiff's inadequate records allowed Dr. Park and the

Healthcare Department to infer that plaintiff's care was of grossly inferior quality, placed the patients at risk of harm, and was in excess of their needs.

¶ 20    In response to plaintiff's argument regarding Dr. Park's mistaken classification[1] of the drug Tramadol prescribed by plaintiff, the ALJ expressly stated that she would not consider the particular drug when determining whether plaintiff violated the Code.  The testimony, therefore, was not prejudicial.  Moreover, whether Dr. Park was correct in classifying the subject drug as a narcotic went to the weight of his testimony, not whether it was speculative.

¶ 21    In sum, we conclude that the ALJ's findings were not clearly erroneous.  See *Marconi*, 225 Ill. 2d at 532. "If the record contains evidence to support the agency's decision, it should be affirmed." *Abrahamson*, 153 Ill. 2d at 88-89.  Simply stated, the Healthcare Department's decision was supported by the evidence.

¶ 22                                      III. Showing Harm

¶ 23    Plaintiff additionally contends the Healthcare Department impermissibly expanded the scope of section 12-4.25(A)(e)(2) of the Code by broadening the statutory language from harmful to risk of harm.

¶ 24    Section 12-4.25(A)(e)(2) of the Code provides that a vendor may be denied, suspended, or terminated from eligibility in the Medicaid program if the vendor is found to have furnished goods or services to a recipient which are harmful.  305 ILCS 5/12-4.25(A)(e)(2) (West 2012).  In the ALJ's report, as adopted by the Healthcare Department, plaintiff was found to have placed the specified patients at a risk of harm by prescribing excessive narcotics, inadequately managing and treating diabetes, failing to provide preventative care, and failing to follow up on issues identified in previous office visits.  Plaintiff argues that the Healthcare Department's expansion

---

[1] Dr. Park referred to Tramadol as a narcotic during the relevant period; however, plaintiff insists the drug was not classified as a narcotic until after the time in question.

of the statutory language to include risk of harm effectively lowered the standard of proof required to establish a violation of the statute.

¶ 25    We first acknowledge that plaintiff failed to raise his argument at the administrative hearing.  "The law in Illinois is wellestablished that, if an argument is not presented in an administrative hearing, it is waived and may not be raised for the first time before the trial court on administrative review.  [Citation].  The rule is particularly applicable where, as here, the issue is one of construction or interpretation of the statutes and rules that most directly concern the agency's operations. [Citation.]" *Lebajo v. Department of Public Aid*, 210 Ill. App. 3d 263, 268 (1991).  The record demonstrates that plaintiff did not raise this argument before the ALJ, instead arguing that plaintiff's treatment controlled the risk of harm to his patients.  The argument, therefore, is waived.

¶ 26    However, even putting waiver aside, the Healthcare Department additionally suspended plaintiff for his violations of sections 12-4.25(A)(e)(1) and (3) of the Code for providing grossly inferior treatment and for treatment in excess of patient needs.  305 ILCS 5/12-4.25(A)(e)(1), (3) (West 2012).  As a result, even assuming, *arguendo*, the ALJ impermissibly expanded the scope of the statute to include risk of harm, plaintiff still was found to have violated the statute and his suspension remains supported by the evidence.

¶ 27                              IV. ALJ's Errors

¶ 28    Plaintiff finally contends that the ALJ's decision should be reversed as a result of multiple errors in the report.

¶ 29    First, plaintiff contends the ALJ erroneously concluded that count II, which found that he placed patients at risk of harm, instead determined that he provided prescriptions in excess of patient needs.  After reviewing the ALJ's findings, it is clear from the context that the ALJ's

10

conclusion was that plaintiff's excessive prescriptions placed his patients at risk of harm. The mention of patients' needs in that section of the ALJ's report was a typographical error. Any "error," therefore, was harmless. However, it also should be noted that any "error" was harmless where the ALJ additionally concluded that plaintiff violated sections 12-4.25(A)(e)(1) and (3) of the Code by authorizing prescriptions resulting in a grossly inferior quality of care and that were in excess of the patients' needs, as previously stated. Either of those bases supported plaintiff's suspension from the Medicaid program.

¶ 30    Next, plaintiff contends the ALJ erred in finding he did not comply with the standard of care in relation to a specific test ordered on patient 1 when he claimed he did comply by signing the test results. The "error" claimed here is merely conflicting testimony. As the finder of fact, it was the ALJ's duty to resolve conflicts in the evidence. *Flaherty v. Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago*, 311 Ill. App. 3d 62, 65 (1999). Simply stated, plaintiff failed to demonstrate the ALJ's findings were against the manifest weight of the evidence. See *id.* (the decision of an administrative agency is against the manifest weight of the evidence only if the opposite conclusion was clearly evident); *Finik v. Department of Employment Security*, 171 Ill. App. 3d 125, 134 (1988) (the mere existence of conflicting testimony is not a sufficient basis to reverse an agency's decision as against the manifest weight of the evidence).

¶ 31    Plaintiff additionally contends the ALJ erred in going outside the record to ascertain whether plaintiff had prior violations without providing him an opportunity to contest the material noticed by the ALJ in violation of the Administrative Procedure Act. Plaintiff concedes that he had no prior violations; therefore, the ALJ's actions were "not detrimental" to him. It is important to note that the challenged conduct of the ALJ inquiring whether plaintiff had a history

of prior program violations occurred after the ALJ found plaintiff had violated the Code in the underlying case. In fact, the ALJ inquired into plaintiff's history in order to determine the appropriate sanction for plaintiff's violations in this case and was not used to determine whether plaintiff violated the Act. A suspension, as was ordered here, is appropriate only where a vendor has no prior history of violations of the Medicaid program. 89 Ill. Adm. Code 140.17 (1992). As a result, we conclude that no error occurred under these circumstances.

¶ 32    Finally, plaintiff contends that the ALJ erred in mentioning the drug Tramadol in her findings of fact even though she specifically found that references to Tramadol should be stricken from the record. Plaintiff argues the agency's decision, therefore, was arbitrary and capricious. We disagree. The ALJ mentioned the drug Tramadol in the findings of fact, as, indeed, plaintiff prescribed the drug to a number of his patients. The ALJ's reference to striking the drug from the record concerned whether the drug was a scheduled narcotic at the time it was prescribed. There is nothing in the record to support plaintiff's contention that the ALJ considered the Tramadol prescriptions as evidence of prescribing excessive narcotics.

¶ 33    In sum, plaintiff's challenged errors do not warrant a reversal of the Healthcare Department's decision.

¶ 34                             CONCLUSION

¶ 35    We affirm the decision of the circuit court, which affirmed the Healthcare Department's finding that plaintiff violated section 12-4.25(A)(e) of the Code and was, therefore, suspended from the Medicaid program for 12 months.

¶ 36    Affirmed.